1  WO

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7                  **FOR THE DISTRICT OF ARIZONA**

8

9  William L. Grabowski,              No. CV-13-01178-PHX-BSB

10              Plaintiff,             **ORDER**

11  v.

12  Carolyn W. Colvin,

13              Defendant.

14  _____

15         William L. Grabowski (Plaintiff) seeks judicial review of the final decision of the

16  Commissioner of Social Security (the Commissioner) denying his application for

17  disability insurance benefits under the Social Security Act (the Act).  The parties have

18  consented to proceed before a United States Magistrate Judge under 28 U.S.C. § 636(b)

19  and have filed briefs in accordance with Local Rule of Civil Procedure 16.1.  For the

20  following reasons, the Court reverses the Commissioner's decision and remands for

21  further proceedings.

22  **I.      Procedural Background**

23         On August 25, 2010, Plaintiff applied for disability insurance benefits and

24  supplemental security income under Titles II and XVI of the Act.  (Tr. 9.)[1]  Plaintiff

25  alleged that he had been disabled since March 1, 2008.  (*Id.*)  After the Social Security

26  Administration (SSA) denied Plaintiff's initial application and his request for

27  _____

28         [1]   Citations to "Tr." are to the certified administrative transcript of record.
    (Doc. 18.)

1   reconsideration, he requested a hearing before an administrative law judge (ALJ).  After
2   conducting a hearing, the ALJ issued a decision finding Plaintiff not disabled under the
3   Act.  (Tr. 9-22.)  This decision became the final decision of the Commissioner when the
4   Social Security Administration Appeals Council denied Plaintiff's request for review.
5   (Tr. 1-5); *see* 20 C.F.R. § 404.981 (explaining the effect of a disposition by the Appeals
6   Council.)  Plaintiff now seeks judicial review of this decision under 42 U.S.C. § 405(g).

7   **II.   Medical Record**

8        The record before the Court establishes the following history of diagnosis and
9   treatment related to Plaintiff's health.   The record also includes opinions from State
10  Agency Physicians who either examined Plaintiff or reviewed the records related to his
11  health, but who did not provide treatment.

12       **A.   Christopher Fleming, M.D.**

13       In May 2007, Plaintiff sought treatment from Dr. Fleming.  (Tr. 318.)  Plaintiff
14  reported that he had injured his left knee, neck, and upper back in an accident at work,
15  and had multiple surgeries on his left knee.  (*Id.*)  Dr. Fleming noted that a May 2007 x-
16  ray and a June 2007 MRI confirmed "osteochondritis dissecans" in Plaintiff's left knee.
17  (*Id.*)  Plaintiff had arthroscopic surgery on his left knee on September 5, 2007.  (*Id.*)
18  After that surgery, Plaintiff reported continuing pain in his left knee and that it
19  periodically "gave out."  (*Id.*)

20       X-rays and an MRI of Plaintiff's left knee in early 2008 showed "no change in the
21  osteochondritis," but showed mild degenerative changes in the left knee, including "full
22  thickness defects of articular cartilage and defect of the underlying bone."  (Tr. 318-19.)
23  In March and April 2008, Dr. Fleming noted that Plaintiff had had "a couple falls" and
24  had "failed conservative treatment."  (Tr. 307-08.)  Plaintiff had a repeat arthroscopic
25  surgery on his left knee in August 2008.  (Tr. 319.)  Plaintiff continued to report left knee
26  pain after that surgery, and also reported left hip pain.  (Tr. 319.)  In November 2008,
27  Dr. Fleming noted that Plaintiff had "moderate-severe" atrophy of the left quadriceps and
28  had recently reinjured his left knee when getting up from the couch.  (Tr. 287.)

1   Dr. Fleming's treatment notes from December 2008 diagnose chondromalacia
2   patella (also known as patellofemoral pain syndrome or "PFPS").   (Tr. 282-83).
3   Dr. Fleming found mild crepitation in both knees and a "positive patellar grind" on the
4   left knee.  (Tr. 284-85.)  Following a final orthopedic consultation, on December 14,
5   2009, Dr. Fleming summarized his findings in a report, noting that Plaintiff's left knee
6   continued to be painful and periodically gave out, his left hip continued to be painful
7   from compensating for the left knee injury, and that similar compensatory overuse had
8   also caused his right knee to become symptomatic.  (Tr. 317-24.)  Dr. Fleming assessed
9   work restrictions including "[n]o prolonged standing and walking.  No running or
10  jumping.  No repetitive squatting or kneeling.  [And n]o climbing."  (Tr. 323.)

11  **B.    G. Sunny Uppal, M.D. and Neil J. Halbridge, M.D.**

12  Dr. Uppal began treating Plaintiff in December 2008.  (Tr. 510.)  He noted
13  Plaintiff's complaints of bilateral knee pain, mid-back pain that radiated to both legs, left
14  hip pain, and insomnia.  (Tr. 510.)  Dr. Uppal noted that Plaintiff's knee pain was
15  exacerbated by "[p]ushing, kneeling, squatting, repetitive use, prolonged standing,
16  walking, pulling, lifting, [and] bending."  (Tr. 511.)  He diagnosed a posttraumatic left-
17  knee osteochondral defect.  (Tr. 513.)

18  On December 3, 2009, Dr. Uppal found the presence of effusion in Plaintiff's right
19  knee, a positive McMurray's test, and that the range of motion (ROM) in flexion was
20  limited to 90 degrees.  (Tr. 569.)  Based on these findings, he diagnosed Plaintiff's right
21  knee with the same osteochondral defect established in his left knee.  (*Id*.)  This diagnosis
22  was corroborated by an MRI of the right knee showing tears in the medial and lateral
23  meniscus.  (Tr. 579.)

24  On December 11, 2010, Dr. Uppal reported that the ROM in both of Plaintiff's
25  knees was limited to 90 degrees of flexion, with "medial joint line tenderness" in the right
26  knee and a "[p]ositive patellar apprehension" test of the left knee.  (Tr. 414.)  He also
27  noted that Plaintiff's past complaints of lower back pain were supported by findings at
28  that visit including observations of lower-back spasms, a ROM limited to ten degrees of

extension, and straight-leg-raise tests positive for back, buttock, and leg pain.  (*Id.*)
Dr. Uppal noted that a lumbar spine MRI confirmed his diagnosis of a 5-millimeter
herniated disc at L5-S1.  (*Id.*)

Dr. Uppal also indicated that Plaintiff had been seeing a cardiologist for
congestive heart failure and cardiac dysrhythmia, and that he needed a total replacement
of his left knee.  (Tr. 413.)  Dr. Uppal wrote that Plaintiff was "applying for Social
Security Disability.  [He felt that] if you add the right knee, left knee, [and] low back [to]
his restrictions . . . he would be limited to sedentary work only.   However, when
combined with his cardiac problem, he is unable to go to work and he would be a
candidate for Social Security Disability."  (Tr. 414.)

On January 20, 2011, Dr. Uppal noted another positive McMurray's test and lower
back spasms.  (Tr. 462.)  He diagnosed "right knee chondromalacia with medial meniscal
degenerative changes," "left knee multiple arthroscopies," and "lumbar radiculitis."
(Tr. 463.)  He again stated that "because of all these issues of the right knee, left knee,
low back pain, [and] cardiac dysfunction, the patient is a candidate for Social Security
Disability."   (*Id.*)   In June 2012, Dr. Uppal reported that he had planned surgery for
Plaintiff's right knee, but the cardiologist did not clear Plaintiff for surgery due to his
cardiac dysrhythmia.  (Tr. 1212.)   In several treatment notes, Dr. Uppal indicated that
symptoms in Plaintiff's knees, including "swelling, clicking, locking, popping, grinding,
stiffness, weakness, and giving way," were aggravated by prolonged standing and
walking, pushing, pulling, kneeling, squatting, bending, climbing stairs, and repetitive
use.  (Tr. 466, 511.)  He determined that Plaintiff was "precluded from doing heavy
lifting, prolonged weight bearing with the right and left knees and legs" (Tr. 478), "stair
climbing, and walking on uneven surfaces."  (Tr. 499.)

During this same period, Plaintiff also saw Dr. Halbridge.  (Tr. 426.)  During his
initial evaluation on July 28, 2009, Dr. Halbridge noted Plaintiff's complaints of pain in
his mid-back, left hip, and bilateral knees, and that his lumbar spine ROM was limited to
ten degrees of extension and ten degrees of left lateral bending.  (Tr. 430.)  He diagnosed

left-knee problems, and "5-millimeter disc herniation at L5-S1" based on a November 2009 lumbar spine MRI.  (Tr. 325, 432.)  Dr. Halbridge concluded that Plaintiff's knee pain was aggravated by prolonged standing and walking, climbing, running, squatting, kneeling, and walking on inclined surfaces (especially descending stairs).  (Tr. 432.)  He found Plaintiff precluded from "squatting, kneeling, climbing, prolonged standing, and prolonged walking," and from "frequent bending, stooping, lifting, and heavy pushing, pulling, or lifting weight over 20 pounds," due to his knee and hip pain.  (Tr. 433-34.)

### C.    Chirag N. Amin, M.D.

In November 2011, Plaintiff saw Dr. Amin regarding his bilateral knee pain, lower back pain, and shoulder pain.   (Tr. 1055-74.)   Dr. Amin's examination revealed tenderness and muscle spasms in Plaintiff's thoracic/lumbar paravertebral muscles, a "[m]arkedly decreased" lumbosacral ROM upon flexion, extension, and lateral bending bilaterally, and positive straight-leg-raise tests.  (Tr. 1058.)  Dr. Amin also reviewed the records of Plaintiff's treatment with Dr. Uppal, Dr. Halbridge, and Dr. Fleming, and the assessment of Plaintiff's heart condition from Dr. Ramtin Anousheh.  (Tr. 1058-61.)

On a Lower Extremity Impairment Questionnaire, Dr. Amin opined that Plaintiff could sit for two hours in an eight-hour workday and stand/walk for "0 to 1" hours; would need to be able to take a ten-minute break from sitting "to get up and move around" every thirty minutes; could not stand/walk continuously in a work setting; could lift up to twenty pounds occasionally and carry up to ten pounds occasionally; would need to have his left leg elevated for ten minutes every one to two hours; would frequently suffer pain, fatigue, or other symptoms that would interfere with his attention and concentration; was capable of no more than "low stress" work; and should avoid exposure to heights, pushing, pulling, kneeling, bending, and stooping.  (Tr. 1069-73.)

### D.    Ramtin Anousheh, M.D.

Dr. Anousheh began seeing Plaintiff in March 2010 and completed a Cardiac Impairment Questionnaire on October 3, 2011.  (Tr. 1048-53.)  He diagnosed Plaintiff with non-ischemic cardiomyopathy and chronic systolic heart failure, characterized by

shortness of breath, fatigue, and weakness, and exacerbated by physical exertion and hot weather.  (Tr. 1048, 1050.)  Dr. Anousheh further assessed that, in an eight-hour workday, Plaintiff could sit for "0 to 1" hours, stand/walk for "0 to 1" hours, and could lift/carry up to twenty pounds occasionally. (Tr. 1050-51.)  He also found that Plaintiff's symptoms would frequently interfere with his attention and concentration, that he could only perform "low stress" work, and that he should avoid temperature extremes, humidity, heights, pushing, pulling, kneeling, bending, and stooping.  (Tr. 1051-52.)

### E.  Reynaldo Abejuela, M.D.

On February 26, 2011, Plaintiff saw State Agency consulting psychiatrist Dr. Abejuela. (Tr. 616-23.)  Plaintiff reported depression and anxiety, problems sleeping, low energy, memory problems, and being socially withdrawn.  (Tr. 617.)  In his mental status examination (MSE), Dr. Abejuela observed that Plaintiff spoke with a mildly depressive tone, exhibited a mildly depressed and anxious affect, and was preoccupied with his pain.  (Tr. 619-20.)  He diagnosed major depressive disorder (Tr. 620), and assessed Plaintiff's impairments in occupational and social functioning as "none to mild." (Tr. 621-22.)  Dr. Abejuela assessed slight impairments in Plaintiff's concentration, persistence, and pace, his ability to understand, carry out, and to remember complex instructions, his ability to respond to coworkers, supervisors, the public, and to respond to usual work situations.  (Tr. 622.)  Dr. Abejuela stated that his "report should be correlated with more recent psychiatric records available, as [he] d[id] not have any other records for comparison."  (Tr. 617-18, 622.)

### F.  Paul Balson, M.D. and Barbara Smith, M.D.

On March 16, 2011, State Agency reviewing psychiatrist Dr. Balson completed a Psychiatric Review Technique form based on his review of the record.  (Tr. 794-807.) He opined that Plaintiff's "psychiatric limitations range[d] from mild to none," and that his psychiatric problems were "non-severe."  (Tr. 807.)  On July 14, 2011, psychiatrist Barbara Smith affirmed Dr. Balson's assessment.  (Tr. 1020-24.)

**G.     V. Phillips, M.D.**

On February 8, 2011, reviewing State Agency physician Dr. Phillips completed a Physical Residual Functional Capacity (RFC) Assessment based on her review of the record.[2] (Tr. 609-15.) Dr. Phillips opined that Plaintiff could stand/walk for three hours in an eight-hour workday due to his knee problems, had no limitations on sitting, and was limited to occasionally pushing and/or pulling with his lower extremities because of his knee problems. (Tr. 610.) She noted that Plaintiff was precluded from "prolonged standing/walking, running or jumping, repetitive squatting, kneeling, or climbing." (Tr. 614.) She also found that Plaintiff's history of cardiac problems did not restrict his functional abilities. (*Id.*)

## III.    Administrative Hearing Testimony

Plaintiff was thirty-one years old and appeared with a non-attorney representative at the administrative hearing. (Tr. 9, 20) Plaintiff testified that he suffered a back and knee injury on the job in April 2007. (Tr. 34, 1055.) That injury worsened and he stopped working in March 2008 due to knee problems. (*Id.*) While covered by workers' compensation related to the 2007 injury, Plaintiff had multiple arthroscopic surgeries on his left knee. (Tr. 37.) He also testified that his physicians had concluded that he needed a total left knee replacement, and that his right knee also required surgery. (*Id.*) Plaintiff also testified that he has cardiac problems that have prevented him from being cleared for knee surgery. (*Id.*)

Plaintiff testified that, in addition to physical problems, he has depression, anxiety, and mood problems. (Tr. 38.) Plaintiff explained that his psychological problems make him very irritable to the point of "flip[ping] out" over things such as his children arguing or the dog barking. (Tr. 39.) These incidents make it hard for Plaintiff to concentrate or socialize. (*Id.*) Plaintiff testified that these episodes occur once or twice a week and typically disrupt his mood for an hour, but sometimes his emotional state does not

---

[2]   Although Dr. Phillips's gender is not clear from the administrative record, Plaintiff refers to Dr. Phillips with feminine pronouns and the Court will do the same. (Doc. 19 at 13.)

1    stabilize for the entire day.  (Tr. 39-40.)  In 2009, Plaintiff was hospitalized after

2    attempting to commit suicide by overdosing, because he "tired of hurting, tired of being

3    out of work, [and] not being to support [his] family financially."  (Tr. 44-45.)

4         Plaintiff stated that he lives with his wife and their five children, ages six to 14.

5    (Tr. 43.)  He testified that his wife usually does the "physical" chores like grocery

6    shopping, but he drives his children to school and sometimes attends their baseball and

7    soccer practices and games.  (Tr. 40-41.)  Plaintiff stated that he uses a cane to walk two

8    blocks or more.  (Tr. 32.)  Plaintiff further testified that some of his medications cause

9    side effects including fatigue or lightheadedness that make it difficult for him to

10   concentrate on simple activities like reading a magazine or watching television.  (Tr. 41-

11   42.)  He stated that he experiences these issues every other day.  (*Id.*)  Plaintiff also

12   testified that he suffers from insomnia and occasionally cannot sleep for consecutive

13   days.  (Tr. 42.)

14        Vocational expert Corrine J. Porter also testified at the administrative hearing.

15   (Tr. 46-51.)  The ALJ asked her to consider a hypothetical individual with functional

16   impairments identical to those set forth by the ALJ in his July 2012 opinion.  (Tr. 13, 47.)

17   The vocational expert testified that such an individual could not perform Plaintiff's past

18   work, but could perform the jobs of check cashier, sewing machine operator, cashier, and

19   telephone quotation clerk.[3]

20   **IV.    The ALJ's Decision**

21        A claimant is considered disabled under the Social Security Act if he is unable "to

22   engage in any substantial gainful activity by reason of any medically determinable

23   physical or mental impairment which can be expected to result in death or which has

24   lasted or can be expected to last for a continuous period of not less than 12 months."

25   42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard

26   for supplemental security income disability insurance benefits).  To determine whether a

27

28        [3]  Plaintiff's relevant past work includes cable installer, grocery manager, aircraft mechanic, and route delivery driver/sales person.  (Tr. 20.)

- 8 -

claimant is disabled, the ALJ uses a five-step sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

### A.    Five-Step Evaluation Process

In the first two steps, a claimant seeking disability benefits must initially demonstrate (1) that he is not presently engaged in a substantial gainful activity, and (2) that his disability is severe.  20 C.F.R. § 404.1520(a) (c).  If a claimant meets steps one and two, he may be found disabled in two ways at steps three through five.  At step three, he may prove that his impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. pt. 404. 20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is presumptively disabled.  If not, the ALJ determines the claimant's residual functional capacity (RFC).  At step four, the ALJ determines whether a claimant's RFC precludes him from performing his past work.  20 C.F.R. §  404.1520(a)(4)(iv).  If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant number in the national economy, considering the claimant's RFC, age, work experience, and education.  If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

### B.    The ALJ's Application of Five-Step Evaluation Process

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period.  (Tr. 11.)  At step two, the ALJ found that Plaintiff had the following severe impairments: "degenerative joint disease of the bilateral knees, status post multiple knee surgeries, and herniated lumbar disc."  (*Id.*)  The ALJ also found that Plaintiff's congestive heart failure, hypertension, and major depressive disorder were not severe impairments.  (*Id.*)  At the third step, the ALJ found that the severity of Plaintiff's impairments did not meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 18.)  The ALJ next concluded that Plaintiff retained the RFC "to

1    perform light work as defined in 20 C.F.R.§ 404.1567(b) and § 416.967(b)."  (Tr. 13.)

2    He specifically found that Plaintiff could "lift and/or carry 20 pounds occasionally, and

3    10 pounds frequently; [and] stand and/or walk for six hours out of an eight-hour

4    workday, for one hour at a time."  (*Id.*)   Additionally, the ALJ found that Plaintiff

5    "require[d] the use of a cane as needed; [was] unlimited in his ability sit; [could not]

6    kneel or crawl; [could not] climb ladders, ropes, or scaffolds; [could not] walk on uneven

7    surfaces; [but could] perform all other postural activities on an occasional basis."  (*Id.*)

8    Finally, the ALJ determined that Plaintiff "should avoid concentrated exposure to

9    extreme heat and humidity; and he should not work at heights."  (*Id.*)   The ALJ

10   concluded that Plaintiff could not perform his past relevant work.  (Tr. 20.)  At step five,

11   the ALJ found that considering Plaintiff's age, education, work experience, and RFC, he

12   could perform other "jobs existing in significant numbers in the national economy."  (*Id.*)

13   The ALJ concluded that Plaintiff was not disabled within the meaning of the Act.

14   (Tr. 21.)

15   **V.    Standard of Review**

16        The district court has the "power to enter, upon the pleadings and transcript of

17   record, a judgment affirming, modifying, or reversing the decision of the Commissioner,

18   with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The district

19   court reviews the Commissioner's final decision under the substantial evidence standard

20   and must affirm the Commissioner's decision if it is supported by substantial evidence

21   and it is free from legal error.  *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198

22   (9th Cir. 2008); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).  Even if the ALJ

23   erred, however, "[a] decision of the ALJ will not be reversed for errors that are

24   harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

25        Substantial evidence means more than a mere scintilla, but less than a

26   preponderance; it is "such relevant evidence as a reasonable mind might accept as

27   adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

28   (citations omitted); *see also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).  In

1   determining whether substantial evidence supports a decision, the court considers the

2   record as a whole and "may not affirm simply by isolating a specific quantum of

3   supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal

4   quotation and citation omitted).

5       The ALJ is responsible for resolving conflicts in testimony, determining

6   credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

7   Cir. 1995).  "When the evidence before the ALJ is subject to more than one rational

8   interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc.*

9   *Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

10  **VI.    Plaintiff's Claims**

11      Plaintiff asserts that the ALJ erred by (1) finding that his congestive heart failure

12  and major depressive disorder were not severe impairments at step two of the sequential

13  evaluation process, (2) rejecting the opinions of State Agency examining physicians

14  Dr. Anousheh and Dr. Amin, and by partially rejecting the opinions of treating physicians

15  Dr. Fleming, Dr. Uppal, and Dr. Halbridge, and (3) by implicitly rejecting Dr. Phillips's

16  opinion regarding Plaintiff's physical RFC without explanation.[4]  (Doc. 19 at 2, 21-23.)

17  Plaintiff further argues that the ALJ's finding that Plaintiff's subjective complaints are

18  not entirely credible is not supported by substantial evidence.  (Doc. 19 at 2.)

19      **A.    Step-Two Determination**

20      At step two of the sequential evaluation process, the ALJ determined that

21  Plaintiff's congestive heart failure and major depressive disorder were not severe

22  impairments. (Tr. 11.)  Plaintiff argues that the ALJ erred in this regard.  (Doc. 19 at 11-

23  18.)  In her response, the Commissioner opposes this assertion and argues that any error

24  was harmless because, although the ALJ did not find Plaintiff's heart problems and

25  depression severe at step two, he considered those impairments in assessing Plaintiff's

26  RFC.  (Doc. 25 at 11-15.)  Plaintiff has not filed a reply in support of his claims.

27

28      [4]  Although Plaintiff does not include his claim related to Dr. Phillips's opinion in
    his Statement of the Issues on page one of his Opening Brief (Doc. 19 at 1), he raises this
    claim in Section B(2) of his Opening Brief.  (*Id.* at 21-23.)

1    The Court agrees with the Commissioner that, even assuming the ALJ erred in

2    failing to find Plaintiff's congestive heart failure and major depressive disorder severe

3    impairments, that error was harmless.  At step two of the sequential evaluation process,

4    the ALJ determines whether a claimant's impairments, or combination of impairments,

5    are severe.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is severe if it

6    "significantly limit[s a claimant's] physical or mental ability to do basic work activities."

7    *See* 20 C.F.R. § 404.1521(a).  Because the ALJ must consider the combined effects of all

8    impairments, severe and non-severe, the critical question at step two is whether a

9    claimant has *any* severe impairment, not whether a particular impairment is severe.  *See*

10   20 C.F.R. § 404.1545 (a)(2) (an ALJ must consider both severe and non-severe

11   impairments when assessing RFC); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007)

12   (finding harmless error when ALJ did not discuss the claimant's bursitis at step two, but

13   discussed it later in the sequential evaluation process and included relevant restrictions in

14   determining the claimant's RFC).

15   Here, although the ALJ did not find Plaintiff's heart problems and depression

16   severe impairments at step two, he later assessed an RFC that limited Plaintiff to a range

17   of light work that took those impairments into account.  (Tr. 13.)  The ALJ stated that,

18   even though he did not consider Plaintiff's heart problems and depression severe, he

19   considered them in his RFC assessment.  (Tr. 11-12 (referring to his RFC assessment as

20   "Finding 5").)  The ALJ specifically noted evidence of Plaintiff's heart problems and

21   depression when he explained his RFC assessment.  (Tr. 14 (discussing chest pain and

22   depression), Tr. 15 (discussing chest pain), Tr. 17 (discussing echocardiogram results and

23   cardiology notes), Tr. 18 (discussing diagnoses of heart problems), Tr. 19 (discussing

24   medical opinions that found Plaintiff's depression non-severe).)

25   Because the ALJ considered Plaintiff's severe and non-severe impairments in

26   determining Plaintiff's RFC, any error at step two, based on his determination that

27   Plaintiff's heart problems and depression were non-severe, was harmless.  *See Johnson v.*

28   *Astrue*, 303 Fed. App'x 543, 546 (9th Cir. 2008) (ALJ did not err in assessing the

1   claimant's RFC when he considered the combined effects of the claimant's impairments
2   and included limitations associated with severe and non-severe impairments); *Lewis*, 498
3   F.3d at 911 (holding that any step two error was harmless because the ALJ discussed the
4   purportedly omitted impairment in the RFC analysis).

5       **B.     Weight Assigned to Medical Opinion Evidence**

6           In weighing medical source evidence, the Ninth Circuit distinguishes between
7   three types of physicians: (1) treating physicians, who treat the claimant; (2) examining
8   physicians, who examine but do not treat the claimant; and (3) non-examining physicians,
9   who neither treat nor examine the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.
10  1995).  Generally, more weight is given to a treating physician's opinion.  *Id*.  The ALJ
11  must provide clear and convincing reasons supported by substantial evidence for
12  rejecting a treating or an examining physician's uncontradicted opinion.  *Id.*; *Reddick v.*
13  *Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ may reject the controverted opinion
14  of a treating or an examining physician by providing specific and legitimate reasons that
15  are supported by substantial evidence in the record.  *Bayliss v. Barnhart*, 427 F.3d 1211,
16  1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.

17          Opinions from non-examining medical sources are entitled to less weight than
18  treating or examining physicians.  *Lester*, 81 F.3d at 831.  Although an ALJ generally
19  gives more weight to an examining physician's opinion than to a non-examining
20  physician's opinion, a non-examining physician's opinion may nonetheless constitute
21  substantial evidence if it is consistent with other independent evidence in the record.
22  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).  When evaluating medical
23  opinion evidence, the ALJ may consider "the amount of relevant evidence that supports
24  the opinion and the quality of the explanation provided; the consistency of the medical
25  opinion with the record as a whole; [and] the specialty of the physician providing the
26  opinion . . . ."  *Orn*, 495 F.3d at 631.

27

28

1

### 1.      Weight Assigned Dr. Amin's and Dr. Anousheh's Opinions

2        Dr. Amin evaluated Plaintiff and opined that he was "incapable of attaining

3   gainful employment," and was "100% permanently disabled." (Tr. 1062.)  Dr. Amin also

4   opined that Plaintiff could stand or walk for zero to one hours in an eight-hour workday.

5   (Tr. 1069.)   The ALJ gave little weight to Dr. Amin's opinion because he only saw

6   Plaintiff one time, and because his opinion was inconsistent with Plaintiff's activities of

7   daily living and with the treating sources who opined that Plaintiff retained the ability to

8   work with restrictions.  (Tr. 15, 19.)  The ALJ further noted that Dr. Amin's opinion that

9   Plaintiff was disabled is an issue that is reserved to the Commissioner.  (Tr. 19.)

10       Dr. Anousheh completed a Cardiac Questionnaire opining that Plaintiff could sit,

11  stand, and/or walk between zero and one hours per eight-hour workday and that he had

12  other postural limitations.  (Tr. 1048-53.)  The ALJ gave little weight to Dr. Anousheh's

13  opinion because he only saw Plaintiff twice and because his opinion was inconsistent

14  with Plaintiff's activities of daily living and with the opinions of the treating physicians.[5]

15  (Tr. 19.)

16       The ALJ gave legally sufficient reasons for assigning little weight to Dr. Amin's

17  and Dr. Anousheh's opinions.  The duration of the treatment relationship and frequency

18  of  contact  is  relevant  to  weighing  medical  opinion  evidence.  *See*  20

19  C.F.R. § 404.1527(c)(2)(i) (stating an ALJ should consider whether a treating source has

20  seen a claimant "a number of times and long enough to have obtained a longitudinal

21  picture" of the claimant's impairment); *Benton v. Barnhart*, 331 F.3d 1030, 1038-39 (9th

22  Cir. 2003) (duration of treatment relationship and frequency and nature of contact

23  relevant in weighing opinion).

24

25

---

26       [5]  To the extent that the ALJ gave Dr. Anousheh's opinion little weight because he
    offered an opinion on an issue reserved to the Commissioner (Tr. 19), that reason does
27  not support the ALJ's assessment of Dr. Anousheh's opinion because, unlike Dr. Amin,
    he did not opine that Plaintiff was disabled.  (Tr. 1048-53.)  However, any error was
28  harmless because the ALJ offered other legally sufficient reasons for assigning little
    weight to Dr. Anousheh's opinion.

1      Additionally, the ALJ properly considered the inconsistencies between the

2  extreme limitations that Dr. Amin and Dr. Anousheh assessed and Dr. Fleming's and

3  Dr. Uppal's opinions that Plaintiff could work with some restrictions (Tr. 323, 499) and

4  with evidence that Plaintiff's daily activities included caring for his five children.

5  (Tr. 19, 40-41.)  *See* 20 C.F.R. § 404.1527(c)(4) (stating an ALJ must consider whether

6  an opinion is consistent with the record as a whole); *Fisher v. Astrue*, 2011 WL 1575449,

7  at *3 (9th Cir. Apr. 27, 2011) (inconsistency between a treating physician's opinion and a

8  claimant's daily activities and school attendance was a specific and legitimate reason for

9  giving little weight to the opinion).

10      Finally, Dr. Amin's opinion that Plaintiff was disabled is not entitled to any

11  special significance because that issue is reserved for the Commissioner.  *See* 20 C.F.R.

12  § 404.1527(d)(1)-(3) (treating source opinions on issues that are reserved to the

13  Commissioner are never entitled to any special significance); *Tonapetyan v. Halter*, 242

14  F.3d 1144, 1149 (9th Cir. 2001) ("Although a treating physician's opinion is generally

15  afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to

16  the existence of an impairment or the ultimate determination of disability.") (citation

17  omitted)).   The ALJ gave legally sufficient reasons for assigning little weight to

18  Dr. Amin's and Dr. Anousheh's opinions.

19             **2.**    **Dr. Uppal's, Dr. Halbridge's, and Dr. Fleming's Opinions**

20      The ALJ gave "considerable weight" to the opinions of treating physicians

21  Dr. Uppal, Dr. Halbridge, and Dr. Fleming finding their statements "precluding [Plaintiff]

22  from heav[y] work or heavy lifting; and precluding [Plaintiff] from prolonged standing

23  and walking; no running or jumping; no repetitive squatting or kneeling; and climbing"

24  are "well-supported by clinical and diagnostic findings and are not inconsistent with the

25  other substantial evidence of record."[6]   (Tr. 19, Tr. 323, 432-33, 511.)   The ALJ's

26

---

27      [6]   Although Plaintiff generally argues that the ALJ erred by implicitly rejecting

28  portions of Dr. Fleming's opinions, he does not specifically identify the portions of
Dr. Fleming's opinions that the ALJ allegedly rejected.   (Doc. 19 at 1, 21-23.)
Accordingly, the Court does not further address this claim.

1    assessment of Plaintiff's RFC includes many of these restrictions, including that Plaintiff
2    could only lift up to twenty pounds.  (Tr. 13.)

3                                    **a.      Dr. Uppal's Opinion**

4                    Plaintiff contends that the ALJ erred because he implicitly rejected
5    Dr. Uppal's opinion (Tr. 466, 511) that Plaintiff should avoid pushing or pulling with his
6    lower extremities by failing to include that limitation in his RFC and in hypothetical
7    questions posed to the vocational expert.[7]  (Doc. 19 at 23.)  In support of this assertion,
8    Plaintiff cites Dr. Uppal's treatment notes from December 11, 2008 and September 1,
9    2010, which indicate that Plaintiff's bilateral knee pain and symptoms of "swelling,
10   clicking, locking, popping, stiffness, weakness, [and] giving away," were worse with,
11   among other functions, "pushing" and "pulling."  (Doc. 19 at 23 (citing Tr. 466, 511).)
12   Although two of Dr. Uppal's treatment notes indicate that pushing and pulling
13   exacerbated Plaintiff's bilateral knee pain, he did not offer an opinion that Plaintiff was
14   precluded from pushing or pulling with his lower extremities.   (Tr. 499, "work
15   restrictions" included "no weight bearing, no stair climbing, no walking on uneven
16   surfaces"; Tr. 592, "work restrictions" included no "heavy lifting, no prolonged weight
17   bearing with right and left knees and legs.")  Accordingly, the ALJ could not have erred
18   by rejecting an opinion that Dr. Uppal did not give.

19                                   **b.      Dr. Halbridge's Opinions**

20            In support of his claim that the ALJ erred by implicitly rejecting Dr. Halbridge's
21   opinion that Plaintiff should avoid pushing and pulling with his lower extremities,
22   Plaintiff cites Dr. Halbridge's July 18, 2009 orthopedic evaluation of Plaintiff.  (Doc. 19
23   at 23.)  Dr. Halbridge concluded that, due to Plaintiff's "left hip, [he] should have work
24   restrictions precluding him from frequent bending, stooping, lifting, and heavy pushing,
25   pulling or lifting weights greater than 20 pounds." (Tr. 434.)  The ALJ stated that he gave

26   _____

27            [7]  Although Plaintiff generally argues that the ALJ erred by implicitly rejecting
     portions of Dr. Fleming's opinions, he does not specifically identify the portions of
28   Dr. Fleming's opinions that the ALJ allegedly rejected.   (Doc. 19 at 1, 21-23.)
     Accordingly, the Court does not further address this claim.

"considerable weight to the exertional assessment[] of . . . Dr. Halbridge," which found Plaintiff precluded from "prolonged standing and walking," "running or jumping", "repetitive squatting or kneeling, and no climbing."  (Tr. 19.)  The ALJ, however, did not mention Dr. Halbridge's conclusion that Plaintiff was precluded from pushing or pulling weights greater than twenty pounds.  (Tr. 19.)  Plaintiff argues that the ALJ erred by failing to explain his "silent[]" rejection of this limitation.  (Doc. 19 at 23.)

The Commissioner asserts that the ALJ was not required to accept all of the limitations found by the various physicians in the record.  (Doc. 25 at 19 n.7.)  The Commissioner further argues that the ALJ stated that he assigned "considerable weight" to Dr. Halbridge's opinions and adopted many of his assessed limitations.  (*Id.*)  The Commissioner, however, does not address whether the ALJ erred by failing to explain his implicit rejection of Dr. Halbridge's pushing/pulling limitation.

Here, because the ALJ stated that he assigned "considerable weight" to treating physician Dr. Halbridge's opinions, but then failed to mention the pushing or pulling restriction, the ALJ implicitly rejected that limitation without explanation.  *See Lingenfelter v. Astrue,* 504 F.3d 1028, 1038 n.10 (9th Cir. 2007) ("Of course, an ALJ cannot avoid these requirements [to state specific, legitimate reasons] simply by not mentioning the treating physician's opinion and making findings contrary to it.").  That implicit rejection "violated the elementary requirement that [ALJs] not only state their findings but explicate the reasons for their decision" and was error.  *Brown v. Bowen*, 794 F.2d 703, 708 (D.C. Cir. 1986).

While Dr. Halbridge's pushing or pulling findings translate into functional limitations that would impact Plaintiff's ability to work and sustain full-time employment, the ALJ did not provide any reason, for rejecting that aspect of the treating physician's opinion.  *See Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) ("The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported

by substantial evidence in the record.") (citation omitted).  As discussed in section VI(d) below, this error was not harmless.

### c.    Dr. Phillips's Opinions

Plaintiff further argues that the ALJ erred by purporting to assign "significant weight" to  non-examining physician Dr. Phillips's opinion that Plaintiff "retain[ed] the ability to perform a light range of work with standing and walking limitations," but rejecting without explanation Dr. Phillips's opinion restricting Plaintiff to standing and/or walking for no more than three hours in an eight-hour workday due to bilateral knee degenerative joint disease, and her opinion restricting Plaintiff to no more than occasional pushing or pulling with his lower extremities.  (Doc. 19 at 21, 23 (citing Tr. 610).)  The Commissioner's response does not address this argument.  (Tr. 25 at 19-20.)

Dr. Phillips completed a physical RFC assessment on February 8, 2011.  (Tr. 609-15.)  She opined that Plaintiff was limited to standing or walking three hours in an eight-hour day due to degenerative joint disease.  (Tr. 610.)  She also opined that Plaintiff was limited to "occasional" pushing and pulling with his lower extremities due to degenerative joint disease in his knees.  (*Id.*)  The ALJ stated that he gave "great weight" to Dr. Phillips's opinion that Plaintiff "retain[ed] the ability to perform a range of light work with standing and walking limitations."  (Tr. 19 (citing Admin. Hrg. Ex. 12F).)  Dr. Phillips, however did not opine that Plaintiff could perform "light work."  (Tr. 609-15.)  Additionally, the ALJ found that Plaintiff could stand or walk for *six* hours in an eight hour day, for one hour at a time, and does not explain his implicit rejection of Dr. Phillips's opinion that Plaintiff was limited to *three* hours of standing or walking.  (Tr. 13-21.)  Similarly, the ALJ's RFC assessment does not include any limitations on Plaintiff's ability to push or pull with his lower extremities (Tr. 13), and the ALJ does not explain his implicit rejection of Dr. Phillips's opinion that Plaintiff was limited to occasional pushing or pulling with his lower extremities.  (Tr. 13-21.)

The Social Security Regulations provide that, although ALJs "are not bound by any findings made by [non-examining] State agency medical or psychological

consultants, or other program physicians or psychologists," they must "consider [their] findings and other opinions . . . as opinion evidence, except for the ultimate determination about whether [a claimant is] disabled," because such specialists are regarded as "highly qualified . . . experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i).

"Unless a treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist." 20 C.F.R. §§ 404.1527(f)(2) (ii), 416.927(f)(2)(ii); *see also* Social Security Ruling[8] (SSR) 96-6p, 1996 WL 374180, at *2 (findings by State agency or other program physicians and psychologists "about the nature and severity of an individual's impairment(s)" must be treated as expert opinion evidence of non-examining sources, and ALJs "may not ignore these opinions and must explain the weight given to the opinions in their decisions").

An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998) (citations omitted); *see Benavidez v. Colvin*, 2014 WL 1245643, at *6-7 (N.D. Cal. Mar. 25, 2014) (ALJ erred by failing to explain why he rejected non-examining physician's opinions); *Haislip v. Colvin*, 2013 WL 5476428, at *10 (E.D. Cal. Sept. 30, 2013) (ALJ must provide specific and legitimate reasons supported by substantial evidence in the record for rejecting non-examining physician's opinions).

Here, the ALJ stated that he gave "great weight" to Dr. Phillips's opinion, but his RFC determination did not account for the sitting or standing and pushing or pulling limitations that Dr. Phillips assessed, and did not explain his apparent rejection of those

---

[8] Social Security Rulings are binding on ALJs. *See Terry v. Sullivan*, 903 F.2d 1273, 1275 n.1 (9th Cir. 1990).

limitations.[9]   (Tr. 19-20.)   The ALJ's failure to provide any reason for rejecting those opinions of Dr. Phillips constitutes error.   *See Benavidez* 2014 WL 1245643, at *6-7; *Haislip*, 2013 WL 5476428, at *10.   Having found error, the Court next determines whether the error was harmless.

### d.      Whether the ALJ's Errors were Harmless

An ALJ's error is harmless when such error is inconsequential to the ultimate non-disability determination.   *See Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1055 (9th Cir. 2006); *see also Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("A decision of the ALJ will not be reversed for errors that are harmless."); *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1991) (harmless error rule applies to review of administrative decisions regarding disability).   As discussed below, the Court concludes that the ALJ's error for failing to discuss his implicit rejection of portions of Dr. Halbridge's and Dr. Phillips's opinions was not harmless to the overall disability determination.   *See Stout*, 454 F.3d at 1055 (an ALJ's error is harmless when it is "irrelevant to the ALJ's ultimate disability conclusion.").

Here, after concluding that Plaintiff could not perform his past relevant work, the ALJ relied on the vocational expert's testimony to determine whether Plaintiff was capable of performing other work that existed in significant numbers in the national economy.   (Tr. 20-21.)   However, when questioning the vocational expert, the ALJ did not include Dr. Phillips's opinion that Plaintiff was limited to three hours of standing or walking in an eight-hour day, Dr. Phillips's opinion that Plaintiff was limited to occasional pushing or pulling with his lower extremities, or Dr. Halbridge's opinion that Plaintiff was precluded from pushing or pulling weights greater than twenty pounds. (Tr. 46-51.)   The ALJ should have provided the vocational expert with a complete hypothetical that accurately reflected Plaintiff's physical RFC.   *See Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009) ("The hypothetical an ALJ poses

---

[9]   The ALJ's RFC assessment did not include any limitations on Plaintiff's ability to push and pull with his lower extremities and found Plaintiff limited to six, not three, hours, of standing or walking.   (Tr. 13.)

to a vocational expert, which derives from the RFC, 'must set out all the limitations and restrictions of a particular claimant.'") (citing *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)); *see also Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993) ("If a vocational expert's hypothetical does not reflect all of the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy.") (internal quotation marks and citation omitted).

These limitations may have elicited different testimony from the vocational expert.[10] For example, Dr. Phillips found that Plaintiff could only perform occasional pushing and pulling with his lower extremities, but the definition of light work, which the ALJ concluded Plaintiff could perform (Tr. 13), requires the ability to engage in frequent lifting or carrying, or exerting force, which includes pushing and pulling upon at least a minimal amount of weight. Specifically, light work requires "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b); SSR 83-10, 1983 WL 31251, at *5. Additionally, "the full range of light work requires standing and walking, off and on, for a total of approximately 6 hours of an 8-hour workday." 20 C.F.R. §§ 404.1567(b), 416.967(b); SSR 83-10, 1983 WL 31251, at *6. "[A] job is also in this category [light work] when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls," which require greater exertion than sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b); SSR 83-10, 1983 WL 31251, at *5.

---

[10] The vocational expert testified that Plaintiff could perform several jobs classified as light work and some jobs classified as sedentary work. (Tr. 47-51.) Although the ALJ noted that the vocational expert testified that Plaintiff could perform the job of telephone quotation clerk, classified as sedentary work, it is not clear whether the ALJ's final disability determination was based on Plaintiff's ability to perform that sedentary position, or his ability to perform less than "the full range of light work." (Tr. 21 (stating that although Plaintiff cannot perform a full range of light work, considering [his] age, education and transferrable work skills, a finding of 'not disabled' is appropriate . . . .").) Additionally, the vocational expert's testimony regarding sedentary work was based on a hypothetical that did not incorporate all of the limitations that Dr. Halbridge and Dr. Phillips assessed.

Here, because the ALJ failed to properly evaluate Dr. Halbridge's and Dr. Phillips's opinions and either explain his rejection of their pushing or pulling limitations and Dr. Phillips's standing or walking limitations, or include those limitations in the RFC and in the questions to the vocational expert, the vocational expert's testimony does not constitute substantial evidence to support the ALJ's findings. Therefore, the Court remands this case to allow the ALJ an opportunity to re-examine the record and Dr. Halbridge's and Dr. Phillips's opinions. The ALJ must incorporate any limitations that are supported by the substantial evidence into the RFC and hypotheticals posed to the vocational expert.[11]

Because the Court finds error with the ALJ's consideration of Dr. Halbridge's Dr. Phillips's opinions and remands this case for renewed consideration of the medical evidence, the Court does not analyze the ALJ's assessment of Plaintiff's credibility. Consideration of Plaintiff's credibility is linked to conclusions regarding the medical evidence. *See* 20 C.F.R. § 416.929. Thus, the re-evaluation of the medical evidence may impact the ALJ's findings as to Plaintiff's credibility.

Accordingly,

**IT IS ORDERED** that this case is **reversed** and **remanded** to the ALJ for further proceedings consistent with this Order. The Clerk of Court shall enter judgment in favor of Plaintiff and against the Commissioner and shall terminate this case.

Dated this 16th day of May, 2014.

_____
Bridget S. Bade
United States Magistrate Judge

---

[11]   Although treating physician Dr. Uppal did not specifically opine that Plaintiff was precluded from pushing and pulling, his treatment notes from December 11, 2008 and September 1, 2010 stating that Plaintiff's bilateral knee pain and related symptoms were aggravated by pushing and pulling (Tr. 466, 511) are consistent with Dr. Phillips's pushing and pulling limitations.